IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HAROLD DeJESUS and<br>MARIA T. DeJESUS,<br><br>              *Plaintiffs*,<br><br>   v.<br><br>KNIGHT INDUSTRIES & ASSOCIATES,<br>INC., *et al.*,<br><br>              *Defendants*. | CIVIL ACTION<br>NO. 10-07434 |

**PAPPERT, J.**                                                                                                          **APRIL 18, 2016**

**MEMORANDUM**

On December 2, 2010, Harold DeJesus ("DeJesus") and his wife Maria (collectively "Plaintiffs") sued Knight Industries & Associates, Inc. ("Knight"), alleging that it defectively designed a lift table involved in an accident which severely injured DeJesus's leg. In support of their allegations, Plaintiffs proffered the expert testimony of Dr. Kevin A. Rider ("Rider"), who drafted a report stating, among other things, that the lift table involved in the accident was defective because it did not have visual or audio warning devices to alert bystanders that the machine was in use. On July 25, 2013, Judge Mary McLaughlin granted Knight's motion to exclude Rider's testimony, holding that his opinions were based on an unreliable methodology.[1] In the same opinion, Judge McLaughlin granted Knight's motion for summary judgment because Plaintiffs failed to provide evidence that the lift table was "defective" as defined by the Restatement (Third) of Torts. Plaintiffs appealed that decision to the Third Circuit Court of Appeals.

---

[1] Judge McLaughlin presided over this case from its inception until July 14, 2015, when it was reassigned. (ECF No. 95.)

1

While that appeal was pending, the Supreme Court of Pennsylvania decided *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014), a seminal products liability decision that articulated a new test for determining if a product is "defective." The Supreme Court also reaffirmed that Pennsylvania was a Restatement (Second) jurisdiction. The Third Circuit vacated the order granting Knight's motion to preclude Rider's testimony and motion for summary judgment and remanded the case for further proceedings in light of *Tincher*. Before the Court is Knight's renewed motion to exclude Rider's testimony on the grounds that *Tincher* does not alter the Court's prior decision. Plaintiffs argue that irrespective of *Tincher*, the Court erred in precluding Rider. The Court agrees with Knight and grants its motion.

## I.

The Third Circuit stated in relevant part:

> Because the law as decided by the highest court of the state has changed while the case was on appeal, and because DeJesus preserved his rights with respect to the issues that have since been resolved in *Tincher,* we will vacate the District Court's grant of summary judgment and remand the case for further proceedings in light of *Tincher.*[ ] As to the issue of admissibility of the testimony of DeJesus's expert witness, whether that witness be Dr. Rider or another expert, we will leave the resolution of that question to the District Court to be determined at the time that expert witness testimony is offered by DeJesus.

*DeJesus v. Knight Indus. & Associates, Inc.*, 599 F. App'x 454, 455 (3d Cir. 2015). The parties disagree over what that language means and the appropriate scope of the Court's review on remand. In its motion, Knight contends that the review should be limited to whether *Tincher* altered the substantive law with respect to Rider's admissibility: "[b]ecause nothing in Judge McLaughlin's analysis changes as a result of the *Tincher* decision, her decision to bar the testimony should be left undisturbed." (Mot. in Lim. at *14.)

2

In response, Plaintiffs' argue that the Third Circuit's opinion and order directs the Court to go further and reconsider Knight's motion on the merits. They contend that "Judge McLaughlin's Opinion is entitled to no weight in this Court's decision, and this Court must conduct its own review of the record in resolving Defendant's Motion." (Opp. Mot. in Lim. at 10.) Plaintiffs maintain that since Rider's opinions were based on evidence of record and sound methods, Judge McLaughlin erred in precluding his testimony and the Court should now deny Knight's motion. (Pls.' Opp. Mot. in Lim. at 13–23, ECF No. 102.) The Court believes the Third Circuit directed it to determine how, if at all, *Tincher* alters Judge McLaughlin's ruling.

## II.

At the time of the accident, Harley Davidson employed DeJesus as a tool and die maker at its factory in York, PA. (Opp. Mot. in Lim., Ex. C ("DeJesus Dep.") 51:1–10, ECF No. 103.) DeJesus's primary responsibility was to repair fixtures that held motorcycle parts in place as they were manufactured. (*Id.* 51:14–52:8.) On December 3, 2008, DeJesus's coworker, Joey Gonzalez ("Gonzalez"), called DeJesus over to inspect a malfunctioning fixture. (*Id*. 66:18–21, 66:24–68:2.) During that conversation, DeJesus stood with his back to a nearby chain rack—a heavy cart on which hung several motorcycle chains. (*Id.* 86:14–24; Ex. D ("Walker Dep.") 25:19–26:14.)

While DeJesus spoke with Gonzalez, another Harley Davidson employee, Jody Black ("Black"), worked nearby to wrap each chain on the chain rack around a clutch. Black then wrapped a chain and clutch in plastic and cardboard and placed it on a lift table manufactured by Knight. (*Id*., Ex. B ("Black Dep.") 16:5–15, 19:14–21, 62:20–63:5.) The lift table did not have any audio or visual signals to alert people that it was in use. (*Id.*, Ex. E-1 ("Zaguroli Dep.") 93:1–5, 114:17–23.) Black placed the lift table next to the chain rack to limit the amount of bending and lifting she had to do. (Black Dep. 31:10–13.)

3

With DeJesus's back still to the chain rack and lift table, Black used the lift table to elevate a cardboard box containing one of the clutches. Unfortunately, a piece of the cardboard contacted the chain rack causing it to topple over. (*Id.* 30:1–33:22.) The chain rack fell on DeJesus and severely injured his right leg. (*Id.*; Walker Dep. 27:11–29:15.) DeJesus was immediately taken to the hospital, where doctors inserted a metal rod into his leg and took skin grafts from his hip to repair his lower leg. (DeJesus Dep. 98:12–99:22.) He remained in the hospital for nineteen days where he continued to experience intense pain. (*Id*. 94:19–95:16, 99:12–101:23.) DeJesus continues to suffer pain and cannot walk for more than ten minutes at a time. (*Id.* 106:10–12, 126:6–8.) He never returned to work and began seeing a psychologist after exhibiting symptoms of post-traumatic stress disorder. (*Id*. 127:3–7, 134:3–14.)

### A.

Plaintiffs sued Knight in the Philadelphia County Court of Common Pleas.[2] (ECF No. 1.) The case was removed based on diversity jurisdiction. (*Id.*) Plaintiffs retained Dr. Rider as an expert to opine on whether the lift table was defective in a manner that caused DeJesus's injury. (Mot. in Lim., Ex. 1 ("Rider Report") at 1, ECF No. 101.) In a report dated September 18, 2012, Rider articulated his opinions. (*Id.*)

In addition to reviewing various documents and deposition transcripts, on February 22, 2012, Rider inspected a lift table manufactured by Knight at a factory owned by a company to which Harley Davidson sold a number of its lift tables after the accident. *See DeJesus v. Knight Indus. & Associates, Inc.*, No. 10-07434, 2013 WL 3833247, at *2 (E.D. Pa. July 25, 2013), *vacated*, 599 F. App'x 454 (3d Cir. 2015). Rider believes that the lift table he inspected was the same table that Black used at the time of the accident based on its similarities to the table in

---

[2] Plaintiffs also sued Gemini Products, Inc. and Engman-Taylor Company, Inc. All parties stipulated to the dismissal of Gemini Products, Inc. on December 19, 2012. (ECF No. 72.) All parties stipulated to the dismissal of Engman-Taylor Company, Inc. on December 27, 2012. (ECF Nos. 74, 75.)

pictures taken immediately after the accident. (*Id.*) Rider concluded that "Knight's failure to install a visual and audible signal deprived DeJesus of [ ] advanced notice . . . and caused the incident." (Rider Report at 8.)

In reaching that conclusion, Rider used a "well-established safety hierarchy" used to eliminate or reduce exposure. (*Id.* at 5.) According to Rider, a manufacturer designing a product should: first, eliminate any hazards through design or by providing less dangerous alternatives; second, guard people from the hazards by implementing safety devices; and third, warn users to be aware of the hazards and how to safely avoid them. (*Id.*) Rider recognized that it may not have been feasible for Knight to eliminate all risk associated with the lift table, but opined that "guards or devices" should have been installed to "shield patrons from exposure to the hazard." (*Id.*) Specifically, he opined that "[h]ad Knight provided a visual and audible signal to activate prior to the table's movements, DeJesus would have been alerted to the table's movement and would reasonably have turned toward the table when he heard the signal and/or when he felt contact on his back . . . ." (*Id.* at 6.) Since Knight did not include audio or visual warnings on the lift table, he concluded that it was "defective in a manner that caused DeJesus's injuries." (*Id.* at 8.) In support of his opinion, Rider compared the lift table to a baggage conveyor belt at airports, which do include audio and visual signals as a safety precaution. (*Id.* at 7.)

Rider also stated that Knight failed to warn operators of the lift table about potential hazards because "[a]t the time of [his] inspection, there were no warnings on the lift table that were visible to the operator." (*Id.* at 8.) He noted that other lift tables in the facility had warning labels, but they had been "defaced." (*Id.*) Rider stated that "Knight should have provided more durable warning labels, or placed the labels in another location" because placing them on "surfaces where loads are expected to be slid on and off[ ] is improper." (*Id.* at 9.) Though

5

Rider recognized that the lift table did have certain warnings in the operating manual, they did not "address[ ] the foreseeable circumstance of the table's load overhanging the edges of the table." (*Id.* at 10.) "Had Knight provided an effective warning to operators to ensure that the loads were properly positioned on the table, DeJesus would not have been injured." (*Id.*)

**B.**

Knight filed a motion to exclude Rider's testimony pursuant to Federal Rule of Evidence 702 and the United States Supreme Court's decision in *Daubert v. Merrell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (ECF No. 52.) Knight also filed a motion for summary judgment on Plaintiffs' design defect, failure to warn, negligence and loss of consortium claims. (ECF No. 53.)

After the parties fully briefed both motions, Judge McLaughlin issued her July 25, 2013 decision granting the *Daubert* and summary judgment motions. *DeJesus*, 2013 WL 3833247, at *1. The Court analyzed the admissibility of Rider's expert opinions using the three factors that the Third Circuit articulated in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 731–43 (3d Cir. 1994): (1) the expert's qualifications; (2) the reliability of the expert's methodology; and (3) the "fit" of the proposed testimony to the issues in the case. Though the Court found Rider to be qualified to offer testimony, it did not find his methods reliable. *DeJesus*, 2013 WL 3833247, at *4–5.

The Court separated Rider's opinion into three conclusions: (1) if the table included audio or visual warnings, DeJesus would not have been injured; (2) Knight defectively designed the lift table by not including audio or visual warning devices; and (3) if the table included certain warning stickers, DeJesus would not have been injured. *Id.* at *4. It then held that the

methodology Rider used to reach each of those conclusions was based on the type of speculation that *Daubert* prohibits.

First, the Court found that Rider failed to use a reliable methodology to support the conclusion that DeJesus would have avoided the chain rack's fall had the lift table had audio or visual warnings. *Id.* Since the record revealed that DeJesus's back faced the lift table, the Court held that there was no evidence to support a finding that DeJesus would have seen a visual warning and moved in time to avoid the chain rack's fall. *Id.* To support his opinion that an audio warning would have prevented DeJesus's injury, Rider stated that "[a]n expected human behavior is that people expect to turn and face auditory signals . . . ." (Rider Report at 6.) The Court held that Rider's reliance on an academic source to support that assertion was insufficient.[3] *DeJesus*, 2013 WL 3833247, at *4. "[I]t is unclear from his report and his deposition how this source provides support." *Id.* The Court noted that Rider relied solely on this academic source and did not attempt to test whether an audio signal would have prevented DeJesus's injury, or otherwise "try to replicate the environment in the factory at the time." *Id.* The Court concluded: "Dr. Rider's conclusion does not rest on a scientific method or procedure, but rather on exactly the type of unsupported speculation that *Daubert* requires courts to disregard." *Id.*

Second, the Court held that Rider's reliance on the "three step safety hierarchy" was of minimal value in assessing whether the lift table was defective. *Id.* "Dr. Rider provides no evidence that manufacturers who do not follow this hierarchy have necessarily designed a defective product. Instead, he merely asserts that because the lift table did not have audio or visual warnings, it was defective." *Id.* at *5.

Third, the Court held that there was no evidence to support Rider's conclusion that DeJesus would not have been injured if the lift table had certain warning labels. *Id.* There was

---

[3] Rider used the "Human Factors Design Handbook" to support this proposition. (Rider Report at 6.)

no evidence to suggest that the lift table that Rider inspected was the same as the one involved in the accident or that there was a "load overhanging the lift table" at the time it made contact with the chain rack. *Id.* Instead, he relied on "his own speculation as to what happened at the time of the accident," which the Court found unreliable under *Daubert* to support his conclusion. *Id.*

Having established that Rider did not use a reliable methodology, the Court did not analyze whether his testimony "fit" the issues in the case, though it noted that such an "analysis would likely lead to the exclusion of Dr. Rider's testimony as well." *Id.* at \*6. Importantly, the Court stated that "[w]hether the lift table is defectively designed depends on an analysis of the factors listed in the Restatement (Third) of Torts[ ]" which Rider's "testimony does not discuss, or even implicate." *DeJesus*, 2013 WL 3833247, at \*6. The Court proceeded to analyze Knight's motion for summary judgment, which it granted on each count.[4] In assessing those claims, the Court relied on the Third Circuit's instruction in *Covell v. Bell Sports, Inc.*, 651 F.3d 357, 360 (3d Cir. 2011), to apply the Restatement (Third) of Torts to design defect claims arising under Pennsylvania law.[5] *DeJesus*, 2013 WL 3833247, at \*6 n.4. On August 20, 2013, Plaintiffs appealed the decision granting Knight's motions. (ECF No. 91.)

## C.

While Plaintiffs' appeal was pending, the Pennsylvania Supreme Court decided *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014). Prior to *Tincher*, Section 402A of the Restatement (Second) of Torts governed Pennsylvania common law. Specifically, the Supreme Court's decision in *Azzarello v. Black Brothers Company*, 391 A.2d 1020 (Pa. 1978), applied

---

[4] The Court dismissed Plaintiffs' claims for: (1) design defect; (2) failure to warn; (3) negligence; and (4) loss of consortium. *DeJesus*, 2013 WL 3833247, at \*6–9.

[5] In *Covell*, the Third Circuit predicted that "if the Pennsylvania Supreme Court were confronted with this issue, it would adopt the Restatement (Third) of Torts, §§ 1 and 2 . . . ." 651 F.3d at 362 (internal citation and quotation marks omitted).

Section 402A to products liability claims and shaped "the legal landscape of products liability in Pennsylvania by divorcing products strict liability from principles of negligence." *Tincher*, 104 A.3d at 344 (discussing *Azzarello*). The *Azzarello* court held that whether the product was "unreasonably dangerous" was a threshold question for the trial court and should not be submitted to the jury. *Id.* at 367 (discussing *Azzarello*). It reasoned that the phrase "unreasonably dangerous" was problematic because it "signaled to the jury that a consumer has the burden to prove an element of negligence," which was improper for a strict liability claim. *Id.* Instead, it held that a jury may find a seller liable "where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any features that renders it unsafe for the intended use." *Id.* (citing *Azzarello*, 391 A.2d at 1027 (internal quotation marks omitted)).

The Supreme Court in *Tincher* overruled *Azzarello*, holding that separating the inquiry of whether the product was "unreasonably dangerous" from whether it was "defective" was "impracticable." *See id.* at 379–80. Accordingly, it rejected the "*per se* rule that negligence rhetoric and concepts were to be eliminated from strict liability law . . . ." *Id.* at 381. Further, contrary to the Third Circuit's prediction in *Covell*, the Supreme Court declined to adopt the Third Restatement approach to strict liability, stating that "Pennsylvania remains a Second Restatement jurisdiction."[6] *Id.* at 357.

The court instead opted for a more "incremental approach," holding that a plaintiff may prove the product is "defective" by showing that either: (1) "the danger is unknowable and unacceptable to the average or ordinary consumer" (the "consumer expectations standard"); or

---

[6] The Restatement (Third) of Torts deems a product defective when "the foreseeable risks could have been reduced or avoided by the use of a reasonable alternative design, and when the failure to utilize such a design has caused the product to be 'not reasonably safe.'" *Tincher*, 104 A.3d at 381 (citing *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1021 (Pa. 2003)).

9

(2) "a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions" (the "risk-utility standard"). *Id.* at 385–91 (internal citations omitted); *see also Punch v. Dollar Tree Stores, Inc.*, 2015 WL 7769223, at *3–4 (W.D. Pa. Nov. 5, 2015) (discussing the holding in *Tincher*). Both are questions for the jury, and "a plaintiff's injury is compensable whether either test is met." *Id.* at 391 (internal citations omitted); *see also Nathan v. Techtronic Indus. N. Am., Inc.*, 92 F. Supp. 3d 264, 269 (M.D. Pa. 2015) (discussing the holding in *Tincher*). By overruling *Azzarello* and articulating a new "composite standard" applicable to products liability claims, the Supreme Court's opinion "changed the landscape of product liability claims in Pennsylvania." *Punch*, 2015 WL 7769223, at *3.

### III.

On July 14, 2015, the case was reassigned to this Court and reopened pursuant to the Third Circuit's decision. (ECF Nos. 95, 99.) The parties agreed to brief Knight's renewed *Daubert* motion to exclude Rider's testimony and, upon resolution of that motion, set a briefing schedule for any motions for summary judgment. (ECF No. 98.) On September 29, 2015, Knight renewed its motion to exclude Rider's testimony. (Mot. in Lim., ECF No. 101.)

### A.

The only question the Third Circuit raised in its opinion was whether *Tincher* altered Judge McLaughlin's decision. *See DeJesus*, 599 F. App'x at 454–54. It did not address the merits of the Court's order granting Knight's motion to exclude Rider's testimony and motion for summary judgment. *Id.*

"It is axiomatic that on remand for further proceedings after decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as

10

established on appeal." *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985); *accord CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc.*, 499 F.3d 184, 197 (3d Cir. 2007); *Laborers' Int'l Union of N. Am. v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 397 (3d Cir. 1994). This axiom is referred to as "the mandate rule," which holds that the trial court "must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Bankers Trust Co.*, 761 F.2d at 949. The Third Circuit has held that "[w]hen a case is remanded for a limited purpose, faithful implementation of the mandate means that the district court will narrowly tailor the proceedings to ensure that the proceedings do not enlarge themselves beyond their narrowly mandated scope . . . ." *CGB Occupational Therapy, Inc.*, 499 F.3d at 197.

Consistent with "the mandate rule," the Court interprets the Third Circuit's remand order as a limited mandate to evaluate how, if at all, *Tincher* alters the prior decision to exclude Rider's testimony—not as a mandate to review the motion for summary judgment and motion to exclude Rider's testimony aside from *Tincher*.[7] Instead of addressing how *Tincher* changes the Court's *Daubert* and Rule 702 analysis in their favor, Plaintiffs argue that Judge McLaughlin erred in granting Knight's motion to exclude Rider's testimony in the first place. (*See generally* Opp. to Mot. in Lim.) For example, Plaintiffs contend that: (1) Rider's opinions were, in fact, based on evidence in the record; (2) the installation of audio and visual warnings on the lift table was practicable and feasible; and (3) Rider relied on recognized and accepted engineering

---

[7] The Third Circuit's citation in its opinion to *Air Products and Chemicals, Inc. v. Hartford Accident and Indemnity Company*, 25 F.3d 177 (3d Cir. 1994) is indicative of its intention to limit the issue on remand. *DeJesus*, 599 F. App'x at 454 n.7. In *Air Products and Chemicals, Inc.*, the Third Circuit provided a limited mandate vacating the portion of the district court's order allocating defense and indemnity costs and remanding where an intervening Supreme Court of Pennsylvania decision altered the relevant law. *Air Prods. & Chems., Inc.*, 25 F.3d at 181. The Third Circuit vacated the "pertinent provisions of the district court's order" and remanded the case "so that the district court can reconsider its order in light of" the new law." *Id*. The Court interprets the Third Circuit's opinion and order as a similarly limited mandate to determine how, if at all, *Tincher* alters the Court's July 25, 2013 ruling.

11

principles. (*Id.* at 13–23.) They do not argue how, if at all, the Supreme Court of Pennsylvania's decision to overrule *Azzarello*, its holding that Pennsylvania remains a Second Restatement jurisdiction, or its articulation of a new "composite standard" affects Rider's admissibility.

Their silence on that point is likely due to the fact that *Tincher* does not alter the reasoning underlying the Court's decision to exclude Rider's testimony. The Third Circuit's decision does not opine on the merits of Judge McLaughlin's decision, the application of *Tincher*, or the substance of the parties' arguments. Rather, it vacated Judge McLaughlin's decision and asks the Court to proceed "*in light of Tincher*." *DeJesus*, 599 F. App'x at 455 (emphasis added).

In *Tincher*, the Supreme Court rejected the notion that a "jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Tincher*, 104 A.3d at 368 (citing *Azzarello*, 391 A.2d at 1027 (internal quotation marks omitted)). It articulated a new standard for assessing whether a product is "defective;" it did not opine on any issue that may impact an expert's methodology. *Id.* at 387–89 (internal quotation marks omitted).

That change in Pennsylvania common law does not affect any aspect of Judge McLaughlin's decision to exclude Rider's testimony. Judge McLaughlin held that Rider's conclusions were premised on "exactly the type of unsupported speculation that *Daubert* requires the courts to disregard." *DeJesus*, 2013 WL 3833247, at *4. Specifically, she excluded Rider's testimony based on his reliance on facts not in the record, his use of an academic source without attempting to replicate the environment at the time of the accident and his assertion that failure to follow the "safety hierarchy" signals that the lift table was defective. *Id.* at *4–5. Her decision

was based on his speculation and the unreliability of his methods, not on the substantive law underpinning Plaintiffs' claims. *See id*. Since *Tincher* does not affect the reliability of Rider's methods, the Court adheres to its previous decision to exclude Rider's testimony.

**B.**

Even though the Third Circuit did not address the merits of the decision to preclude Rider's testimony—and thus the issue on remand is limited to whether *Tincher* affects the Court's previous ruling—Plaintiffs ask the Court to reconsider that ruling on other grounds. Specifically, they contend that Judge McLaughlin's order precluding Rider "was a clear misapplication of *Daubert*." (Opp. to Mot. in Lim. at 3.) Although the law of the case doctrine "does not constrain the trial court with respect to issues not actually considered by an appellate court," the principles of that doctrine counsel this Court to "exercise [its] discretion" against re-visiting prior rulings not addressed on appeal. *Daiichi Sankyo, Inc. v. Apotex, Inc.*, No. 030937, 2009 WL 1437815, at *8 (D.N.J. May 19, 2009) (citing *Pub. Interest Research Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116–17 (3d Cir. 1997) (internal quotation marks omitted)). "A court has the power to revisit prior decisions of its own . . . although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'"[8] *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (internal citation and quotation marks omitted).

---

[8]  Plaintiffs argue that a vacatur requires the Court to "conduct its own review of the record in resolving Defendant's Motion." (Opp. to Mot. in Lim. at 10.) That interpretation of a vacatur as requiring the Court to relitigate all issues—even those aside from *Tincher*—undermines the purpose of the law of the case doctrine, which is intended "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848, 856 (3d Cir. 1994) (quoting 18 Charles A. Wright, Arthur R. Miller, Edward Cooper, Federal Practice and Procedure § 4478 at 788 (2d ed.1981) (internal quotation marks omitted). Indeed, the directive to a district court to exercise discretion in revisiting prior rulings not addressed on appeal suggests—contrary to Plaintiffs' position—that a vacatur does not require the court to relitigate all issues.

13

Judge McLaughlin's ruling precluding Rider's testimony is not "clearly erroneous" and does not subject Plaintiffs to "manifest injustice." The decision parsed each of Rider's conclusions and subjected them to the well-established admissibility framework articulated by the Third Circuit in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 731–43. That Plaintiffs disagree with the decision does not render it "clearly erroneous" or subject them to a manifest injustice. *See Donegan v. Livingston*, 877 F. Supp. 2d 212, 226 (M.D. Pa. 2012), *aff'd*, 523 F. App'x 195 (3d Cir. 2013) (rejecting argument that granting motion to reconsider would correct clear error of law or prevent manifest injustice because motion should not be used to "reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant[ ]") (internal citations and quotation marks omitted).

## C.

Plaintiffs advance two arguments based on the Third Circuit's statement that it "leave[s] the resolution of [the admissibility of Rider or another expert] to the District Court to be determined at the time that expert witness testimony is offered by DeJesus." *DeJesus*, 599 F.App'x at 455. First, Plaintiffs contend that these instructions "unambiguously state that the trial court may not rule on the admissibility of Dr. Rider *until Plaintiffs offer his testimony—and not, as here, in response to Defendant's second motion to preclude Dr. Rider*." (Plaintiffs' Supp. Mem. in Opp. to Mot. in Lim. at *5, ECF No. 109.) The Court does not read this language as disallowing a renewed motion to preclude Rider's testimony, and finds no logical basis why it would be forced to delay its exclusion of Rider until the time he is offered at trial. The Third Circuit's statement instead contemplated that Plaintiffs *may* offer a new expert in light of the change in law, at which time the Court may evaluate the admissibility of that new testimony.

14

Second, Plaintiffs argue that since Knight "lost before the Third Circuit," reviewing Rider's admissibility on remand violates the "law of the case" doctrine. (*Id.* at *5, 7.) That logic, however, misconstrues the doctrine and wrongly interprets the Third Circuit's decision as a reversal based on existing law rather than a vacatur and remand "for further proceedings in light of" a change in law. *DeJesus*, 599 F. App'x at 455. The "issue of applicability of *Tincher* to [Plaintiffs'] claims" and the admissibility of Rider's testimony are not issues that the Third Circuit conclusively ruled upon, but open questions that the Third Circuit left for the Court. *Id.* ("[DeJesus] also reserved his right to brief the issue of applicability of *Tincher* to his claims in his appellate brief.").

An appropriate order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J