IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HAROLD DeJESUS and
MARIA T. DeJESUS,

                    *Plaintiffs*,

        v.

KNIGHT INDUSTRIES & ASSOCIATES,
INC., *et al.*,

                    *Defendants*.

CIVIL ACTION
NO. 10-07434

PAPPERT, J.                                                    SEPTEMBER 8, 2016

## MEMORANDUM

Harold DeJesus ("DeJesus") sued Knight Industries & Associates, Inc. ("Knight") alleging that Knight defectively designed a lift table it sold to DeJesus's former employer, Harley Davidson. DeJesus's right leg was severely injured when a Harley Davidson employee raised the lift table, causing the materials it was supporting to make contact with a nearby chain rack. The chain rack fell onto DeJesus, who was facing away from the lift table and chain rack. He brings strict liability defective design, failure to warn and negligent design claims against Knight, contending that the lift table should have been equipped with audio and visual alarms.[1]

Judge Mary McLaughlin granted Knight's motion for summary judgment on DeJesus's strict liability design defect claim because DeJesus failed to provide evidence that the lift table was "defective" as defined by the Restatement (Third) of Torts. Judge McLaughlin then held that since there was no design defect, DeJesus could not support a claim for negligent design.

---

[1]     DeJesus's wife, Maria DeJesus, also brings a claim against Knight for loss of consortium. (Pls.' Compl., Count X, ECF No. 1.)

She also found that the record evidence did not support his failure to warn claim.  DeJesus and

his wife appealed that decision to the Third Circuit Court of Appeals.

While the appeal was pending, the Supreme Court of Pennsylvania decided *Tincher v.

Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014), a seminal products liability decision that articulated

a new test for determining whether a product is "defective" within the strict liability context.  In

light of *Tincher*, the Third Circuit vacated the order granting Knight's motion for summary

judgment and remanded the case for further proceedings.  Before the Court is Knight's renewed

motion for summary judgment on the grounds that *Tincher* does not alter the Judge

McLaughlin's previous ruling.  DeJesus contends that summary judgment on his strict liability

design defect claim is not warranted under *Tincher* and that the court erred in granting summary

judgment on his negligent design claim.  For the reasons that follow, the Court grants in part and

denies in part Knight's motion.

## I.

## A.

At the time of the accident, Harley Davidson employed DeJesus as a tool and die maker

at its factory in York, Pennsylvania.[2]  (Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp."), Ex.

1 ("DeJesus Dep.") 51:1–10, ECF No. 117.)  DeJesus's primary responsibility was to repair

fixtures that held motorcycle parts in place as they were manufactured.  (DeJesus Dep. 51:14–

52:8.)  On December 3, 2008, DeJesus's coworker, Joey Gonzalez ("Gonzalez"), called DeJesus

over to inspect a malfunctioning fixture.  (DeJesus Dep. 66:18–21, 66:24–68:2.)  During that

conversation, DeJesus stood with his back to a nearby chain rack—a heavy cart on which hung

---

[2]       Knight failed to provide a statement of undisputed material facts in the manner required by the Court's
Policies and Procedures.  Knight also failed to attach any record evidence in support of its motion.  In recounting the
undisputed material facts the Court accordingly relies on the record evidence cited in DeJesus's opposition brief and
the facts as recounted in Judge McLaughlin's July 25, 2013 memorandum.

several motorcycle chains.  (DeJesus Dep. 86:14–24; Pl.'s Opp., Ex. 2 ("Walker Dep.") 25:19–26:14.)  The cart had wheels and was considered by some Harley employees to be "unstable and top-heavy."  *DeJesus v. Knight Indus. & Associates, Inc.*, No. 10-07434, 2013 WL 3833247, at *2 (E.D. Pa. July 25, 2013), *vacated*, 599 F. App'x 454 (3d Cir. 2015).

While DeJesus spoke with Gonzalez, another Harley Davidson employee, Jody Black ("Black"), worked nearby to wrap each chain on the chain rack around a clutch.  Black wrapped a chain and clutch in plastic and cardboard and placed it on a lift table manufactured by Knight. (Pl.'s Opp., Ex. 3 ("Black Dep.") 16:5–15, 19:14–21, 62:20–63:5.)

The lift table that Black used was a tabletop that she could raise and lower with an actuated air bag.  (Pl.'s Opp., Ex. 4 ("Fegely Dep.") 35:6–8.)  The table could range in height from 10 inches to 34 inches and could support up to 4,000 pounds.  (*Id.* 35:12–19.)  The lift table did not have any audio or visual signals to alert people that it was in use.  (Pl.'s Opp., Ex. 8 ("Zaguroli Dep.") 93:1–5, 114:17–23.)  Black placed the lift table next to the chain rack to limit the amount of bending and lifting she had to do.  (Black Dep. 31:10–13.)

With DeJesus's back to the chain rack and lift table, Black used the lift table to elevate a cardboard box containing one of the clutches.  A piece of the cardboard contacted the chain rack causing it to topple over.  (Black Dep. 30:1–33:22.)  The chain rack fell onto DeJesus and severely injured his right leg.  (*Id.*; Walker Dep. 27:11–29:15.)  DeJesus was immediately taken to the hospital, where doctors inserted a metal rod into his leg and took skin grafts from his hip to repair his lower leg.  (DeJesus Dep. 98:12–99:22.)  He remained in the hospital for nineteen days where he continued to experience intense pain.  (DeJesus Dep. 94:19–95:16, 99:12–101:23.) DeJesus continues to suffer pain and cannot walk for more than ten minutes at a time.  (DeJesus

Dep. 106:10–12, 126:6–8.)  He never returned to work and began seeing a psychologist after

exhibiting symptoms of post-traumatic stress disorder.  (DeJesus Dep. 127:3–7, 134:3–14.)

**B.**

The lift table operator's manual, which Knight provided with every lift table it sold,

included the following safety warning:

> No. 6. All loads should be centered on the table top before lifting;
> No. 7. Prior to operating the table, ensure that all personnel on or
> near the table are aware of its imminent operation and that no
> person will be in harm's way during the use of the unit; No. 8.
> Ensure that objects are clear of the area beneath the table and
> immediately surrounding the perimeter of the table while it is in
> use.

(Def.'s Opp., Ex. 11 ("Owner's Manual") at A. 761.)  Black had not read the manual before

using the lift table.  (Black Dep. 35:12–14.)

Knight placed warning stickers on the surface of every lift table before it was shipped to

the customer.  (Zaguroli Dep. 79:22–80:6.)  One of those stickers read: "To avoid bodily injury,

stand clear while lift table is moving."  (Def.'s Opp., Ex. 12 at A. 768.)  Black testified that she

did not notice any stickers on the lift table before she began using it.  (Black Dep. 35:15–19.)

Knight manufactured its lift tables in accordance with "a customer specification sheet that

told [Knight] what [the customer] wanted . . . [Knight] to build."  (Zaguroli Dep. 36:22–24.)

Certain elements of the lift table could accordingly be customized to the customer's

specifications, such as the inclusion of edges on the corner of the tabletop to prevent material

from sliding and a protective guard stretching from the table to the floor.  (Fegely Dep. 20:14–

25.)  At the customer's request, Knight could also equip the table with flashing lights or an

alarm.  (Zaguroli Dep. 93:16–94:3.)  Harley Davidson did not request any lift table it purchased

from Knight to have flashing lights or an alarm while in use.  (Zaguroli Dep. 100:17– 101:23.)

4

## II.

### A.

On December 2, 2010 DeJesus filed a complaint against Knight in the Philadelphia County Court of Common Pleas.[3]  (ECF No. 1.)  The case was removed to this Court based on diversity jurisdiction on December 21, 2010.  (*Id.*)  After the parties took discovery, Knight filed a motion in limine to preclude DeJesus's expert, Dr. Kevin Rider, and a motion for summary judgment on all claims.  (ECF Nos. 52–53.)  On July 25, 2013 Judge McLaughlin, who presided over this case from the time it was removed until it was reassigned on July 14, 2015, (ECF No. 95), issued an opinion and order granting Knight's motions.  (ECF Nos. 89–90.)

After excluding Dr. Rider,[4] Judge McLaughlin addressed each of DeJesus's claims against Knight.  The court applied the Restatement (Third) of Torts to analyze DeJesus's strict liability design defect claim, stating that "[t]he Third Circuit has instructed federal district courts to apply the Restatement (Third) to design defect claims arising under Pennsylvania law." *DeJesus*, 2013 WL 3833247, at *6 n.4 (citing *Covell v. Bell Sports, Inc.*, 651 F.3d 357, 360 (3d Cir. 2011)).  Under that standard, a product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller . . . and the omission of the alternative design renders the product not reasonably safe." *Id.* at *6 (citation and internal quotation marks omitted).  Judge McLaughlin held that DeJesus did not advance facts to support a finding of design defect because there is no evidence "from which a reasonable jury could find that audio or visual

---

[3]     DeJesus also sued Gemini Products, Inc. and Engman-Taylor Company, Inc.  All parties stipulated to the dismissal of Gemini Products, Inc. on December 19, 2012.  (ECF No. 72.)  All parties stipulated to the dismissal of Engman-Taylor Company, Inc. on December 27, 2012.  (ECF Nos. 74, 75.)

[4]     Judge McLaughlin held that Rider did not use a reliable methodology and his opinion was accordingly properly excluded under *Daubert v. Merrell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *DeJesus*, 2013 WL 3833247, at *3–5.

warnings constitute a reasonable alternative design." *Id.* The court stated that DeJesus's contention that Knight could have equipped the lift table with audio and visual warnings "conflates feasibility with reasonableness . . . . [J]ust because such warnings are feasible does not mean they are a reasonable alternative design." *Id.* at *7.

The court then dismissed DeJesus's negligent design claim: "The plaintiff[] argue[s] that Knight breached its duty of care by manufacturing a defective product. Of course, this argument rests on the assumption that the lift table was defective." *Id.* at *9. Since the court had already held that the lift table was not defective under the Restatement (Third), it concluded that "no reasonable jury could find that Knight breached its duty of care by manufacturing a reasonably safe product." *Id.*

The court then separately analyzed Dejesus's failure to warn claim, holding that "no reasonable jury could find that that Knight's lift table was defective because of inadequate instructions or warnings." *Id.* at *8. Judge McLaughlin noted that Knight provided an owner's manual with every lift table it sold specifically warning users not to operate the table with people nearby. *Id.* Further, Judge McLaughlin held that there was no evidence in the record to suggest—as DeJesus contended—that a warning sticker cautioning against operating the lift with a load overhanging the edge of the tabletop was not present on the surface of the lift table. *Id.* Even if such a sticker was not present, however, the court stated that DeJesus's failure to warn claim still failed because there was no evidence to suggest that a load overhang caused the chain rack to fall. *Id.* (citing *Hartsock v. Wal–Mart Stores East, Inc.*, No. 07-cv-3200, 2009 WL 4268453, at *1 (E.D. Pa. Nov. 23, 2009) (holding that a plaintiff must provide evidence demonstrating that the defendant's failure to warn caused the plaintiff's injuries)).[5]

---

[5]     The court also granted summary judgment on Mrs. DeJesus's loss of consortium claim since such a claim is derivative of DeJesus's negligence and strict liability claims. *DeJesus*, 2013 WL 3833247, at *9.

**B.**

DeJesus appealed the court's decision to the Third Circuit.  (ECF No. 91.)  On November 19, 2014, while DeJesus's appeal was pending, the Supreme Court of Pennsylvania decided *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014), a decision that significantly altered the framework for determining whether a product is "defective."  In *Tincher*, the Supreme Court also reaffirmed, contrary to the Third Circuit's prediction, that Pennsylvania was a Second Restatement Jurisdiction.  *Id.* at 406–15.

On April 6, 2015 the Third Circuit vacated the court's ruling granting Knight's motion for summary judgment and motion to preclude Dr. Rider.  *See DeJesus v. Knight Indus. & Associates, Inc.*, 599 F. App'x 454 (3d Cir. 2015).  The Third Circuit stated in relevant part:

> Because the law as decided by the highest court of the state has changed while the case was on appeal, and because DeJesus preserved his rights with respect to the issues that have since been resolved in *Tincher,* we will vacate the District Court's grant of summary judgment and remand the case for further proceedings in light of *Tincher.*[1]

*Id.* at 455.

Knight accordingly renewed its motion for summary judgment, contending that "*Tincher* does not mandate that this Court disturb Judge McLaughlin's decision granting summary judgment."[6]  (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Knight's Mot.") at 1, ECF No. 116.)  In response, DeJesus argues that the Court should deny Knight's motion for summary judgment because the evidence "demonstrates genuine issues of material fact on every element of [his] strict liability/design defect claim" after *Tincher*.  (Pl.'s Opp. at 4.)  DeJesus also contends that this Court should deny summary judgment with respect to his negligent design claim "because

---

[6]      Knight separately renewed its motion to exclude Dr. Rider, which the Court granted on April 18, 2016.  *See DeJesus v. Knight Indus. & Associates, Inc.*, No. 10-cv-07434, 2016 WL 1555793 (E.D. Pa. Apr. 18, 2016).

Judge McLaughlin clearly misapplied Pennsylvania law by dismissing that claim solely on the grounds that [DeJesus] had failed to prove a product defect under the Third Restatement of Torts." (*Id.* at 2.)  The Court heard oral argument on Knight's motion on July 27, 2016.  (ECF No. 123.)

### III.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the plaintiff.  *Id.* at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*

When ruling on a motion for summary judgment, the Court may only rely on admissible evidence.  *See, e.g.*, *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999).  A Court must view the facts and draw all reasonable inferences in favor of the nonmoving party.  *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## IV.

In a strict liability claim alleging design defect, a plaintiff must show: (1) the product was defective; (2) the defect proximately caused the plaintiff's injury; and (3) the defect existed at the time the product left the defendant's control.  *See Wright v. Ryobi Techs., Inc*, No. 15-cv-1100, 2016 WL 1241860, at *5 (E.D. Pa. Mar. 30, 2016) (citing *Pavlik v. Lane Ltd./Tobacco Exp. Int'l*, 135 F.3d 876, 881 (3d Cir. 1998)).  In 1966 the Supreme Court of Pennsylvania adopted Section 402A of the Second Restatement to evaluate whether a product was defective.  Section 402A provides in relevant part:

> (1)  One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> > (a)  the seller is engaged in the business of selling such a product, and
> >
> > (b)  it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A(1); *see Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966) (adopting Section 402A).

Prior to *Tincher*, the Pennsylvania Supreme Court's decision in *Azzarello v. Black Brothers Company*, 391 A.2d 1020 (Pa. 1978), set forth the strict product liability framework under Pennsylvania law in light of the language in Section 402A.  In that case, the Supreme Court stated: "the mere fact that we have approved Section 402A, and even if we agree that the phrase 'unreasonably dangerous' serves a useful purpose in predicting liability in this area, it does not follow that this language should be used in framing the issues for the jury's consideration."  *Azzarello*, 391 A.2d at 1026.  The Supreme Court reasoned that the phrase

"unreasonably dangerous" was problematic because it "burdened the injured plaintiff with proof of an element which rings of negligence," which was improper for a strict liability claim.  *Id.* at 1025.

Accordingly, the Supreme Court stated that the jury's role is to resolve any "dispute as to the condition of a product," but not whether it was "unreasonably dangerous" or defective.  *Id.* at 1025.  That determination was instead a threshold question for the trial court:  "It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint."  *Id.*

In *Tincher*, the Supreme Court overruled *Azzarello*, holding that separating the inquiry of whether the product was "unreasonably dangerous" from whether it was "defective" was "impracticable" and "incompatible with the basic principles of strict liability."  *See Tincher*, 104 A.3d at 379–80.  Specifically, the court stated:

> [I]n a jurisdiction following the Second Restatement formulation of strict liability in tort, the critical inquiry in affixing liability is whether a product is "defective"; in the context of a strict liability claim, whether a product is defective depends upon whether that product is "unreasonably dangerous."  Yet, *Azzarello* divorced one inquiry from the other: under the *Azzarello* scheme, the trial court serves as the gate-keeper of one question with the apparent task of deciding as a matter of law and policy whether a product is one even susceptible to a strict liability claim.  As a practical matter, the *Azzarello* decision did not indicate at which point of the trial the court should consider the question, nor what pleadings or evidence would be relevant to the inquiry; the Court did suggest, however, that the matter "d[id] not fall within the orbit of a factual dispute."

*Id.* at 380.  Further, the Supreme Court in *Tincher* stated that except in obvious circumstances, "trial courts simply do not necessarily have the expertise to conduct the social policy inquiry into the risks and utilities of a plethora of products and to decide, as a matter of law, whether a

product is unreasonably dangerous." *Id.* Accordingly, the Supreme Court rejected the "*per se* rule that negligence rhetoric and concepts were to be eliminated from strict liability law . . . ." *Id.* at 381.

Despite overruling *Azzarullo* and contrary to the Third Circuit's prediction in *Covell*, the Supreme Court refused to take "the decisional leap" of adopting the Restatement (Third) of Torts. In general, the Third Restatement "incorporates negligence-based foreseeability concepts that are historically absent from Pennsylvania's products liability analysis under the Restatement (Second) of Torts." *Punch v. Dollar Tree Stores, Inc.*, No. 12-cv-154, 2015 WL 7769223, at *3 (W.D. Pa. Nov. 5, 2015), *report and recommendation adopted sub nom. Punch v. Dollar Tree Stores, Inc.*, No. 12-cv-154E, 2015 WL 7776601 (W.D. Pa. Dec. 2, 2015) (citing *Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F. Supp. 2d 606, 628 n.14 (W.D. Pa. 2012)). The Third Restatement, for example, focuses on the foreseeable risks of harm and whether an alternative design would have minimized those risks.[7] *Id.* (citation omitted).

The Supreme Court in *Tincher* clarified that "Pennsylvania remains a Second Restatement jurisdiction." *Tincher*, 104 A.3d at 357. Rather than adopting the Third Restatement, the court opted for a more "incremental approach," holding that a plaintiff may prove the product is "defective" by showing that either: (1) "the danger is unknowable and unacceptable to the average or ordinary consumer" (the "consumer expectations standard"); or (2) "a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions" (the "risk-utility standard"). *Id.* at 385–91 (citations omitted). A plaintiff may proceed under either theory, but only needs to

---

[7] The Third Restatement deems a product defective when "the foreseeable risks could have been reduced or avoided by the use of a reasonable alternative design, and when the failure to utilize such a design has caused the product to be 'not reasonably safe.'" *Tincher*, 104 A.3d at 381 (citing *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1021 (Pa. 2003)).

prevail on one to demonstrate the existence of a defect.  *Id.* at 391.  The Supreme Court further

stated that a court may only "remove" the issue from the jury, "for example, via adjudication of a

dispositive motion . . . where it is clear that reasonable minds [cannot] differ on the issue."  *Id.* at

407 (citation and internal quotation marks omitted).

## V.

Without guidance from the Pennsylvania Supreme Court, and in accordance with the

Third Circuit's instruction in *Covell* that federal district courts apply the Third Restatement to

design defect claims arising under Pennsvlania law, Judge McLaughlin analyzed DeJesus's strict

liability design defect claim under that framework.  Pursuant to the Third Circuit's order, the

Court must now evaluate the viability of DeJesus's claims in light of *Tincher*.

Knight contends that *Tincher* does not alter Judge McLaughlin's outcome because

DeJesus has "not proferred the required evidence to prove either" the consumer expectations or

risk-utility test.  (Def.'s Mot. at 10.)  It argues rather summarily that since "reasonable minds

[cannot] differ on the issue summary judgment is appropriate."  (*Id.* (internal quotation marks

omitted).)  DeJesus contends that disputed issues of material fact remain as to both tests which

are more properly resolved by the jury.  (Pl.'s Opp. at 27–37.)

## A.

The consumer expectations test provides that a product is defective if, upon normal use, it

is "dangerous beyond the reasonable consumer's contemplations."  *Tincher*, 104 A.3d at 387.

Under this analysis, a "product is in a defective condition if the danger is unknowable and

unacceptable to the average or ordinary consumer."  *Id.*  Accordingly, this test has been

characterized as reflecting the "surprise element of danger" latent in a product's use.  *Id.* (citation

and internal quotation marks omitted).  A product is not defective if the ordinary consumer

would reasonably anticipate and appreciate the dangerous condition of the product and the attendant risk of injury of which the plaintiff complains. *Id.* The consumer expectations standard requires the Court to assess a number of factors, including the nature of the product, the identity of the user, the product's intended use and user, and any express or implied representations by the manufacturer or other seller. *Id.*

In describing the consumer expectation test and how it operates in conjunction with the risk-utility analysis, the Supreme Court in *Tincher* relied in part on the reasoning of the California Supreme Court, which adopted the same "composite standard" of the consumer expectations and risk-utility test in 1978. *See id.* at 402 (discussing *Barker v. Lull Eng'g Co.*, 573 P.2d 443, 453 (Cal. 1978)). The Pennsylvania Supreme Court cited favorably to *Soule v. Gen. Motors Corp.*, 882 P.2d 298, 308 (Cal. 1994), a decision that discussed the application of the consumer expectations standard.

In *Soule*, plaintiff sued General Motors ("GM") for strict liability defective design after she injured her ankles when her car, manufactured by GM, collided with another vehicle. 882 P.2d at 301. The collision caused her steering wheel to collapse inward which in turn caused the car's floorboard to crumple upward, leading to the injuries. *Id.* At trial, the court instructed the jury on product defect under both the consumer expectation and risk-utility tests. *See id.* at 311. After the jury found for Soule, GM appealed, contending that the trial court erred by instructing the jury on the consumer expectations standard in a case involving a complex design defect. *Id.* at 303.

The California Supreme Court agreed. The court stated that "the consumer expectations test is reserved for cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective

*regardless of expert opinion about the merits of the design*." *Id.* at 308 (emphasis in original). It continued: "The crucial question in each individual case is whether the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." *Id.* at 309. Where there are no facts to permit a finding under this standard, "the jury must be instructed solely on the alternative risk-benefit theory of design defect." *Id.* Accordingly, the California Supreme Court held that that jury should not have been instructed on the "ordinary consumer expectations" because the design defect was one of technical and mechanical detail: "Nor would ordinary experience and understanding inform [an ordinary automobile] consumer how safely an automobile's design should perform under the esoteric circumstances of the collision at issue here."[8] *Id.* at 310.

That holding is consistent with other decisions stating that the consumer expectations test is only appropriate in cases involving a product "within the common experience of ordinary consumers." *Id.* at 306 (citation omitted); *see, e.g.*, *Campbell v. Gen. Motors Corp.*, 649 P.2d 224, 233 (Cal. 1982) (holding that jurors were able to evaluate whether absence of "grab bars" on public transportation bus constituted design defect under the consumer expectation test because "public transportation is a matter of common experience"); *Lunghi v. Clark Equip. Co.*, 200 Cal. Rptr. 387, 393 (Ct. App. 1984) (upholding trial court's refusal to instruct on consumer expectations in case involving design defect allegations of a Bobcat model loader, stating that "[t]his does not seem to be the kind of question that twelve ordinary people drawn from the community at large could evaluate based on their own 'common knowledge'").

---

[8] The court ultimately held, however, that the error was harmless "because it [was] not reasonably probable defendant would have obtained a more favorable result in its absence." *Soule*, 882 P.2d 298 at 310.

In *Tincher*, the Pennsylvania Supreme Court articulated those same principles with respect to the application of the consumer expectations test. The court stated that "a product whose danger is vague or outside the ordinary consumer's contemplation runs the risk of being subjected to arbitrary application of the strict liability doctrine." *Tincher*, 104 A.3d at 388. Accordingly, the trial court must "act in its ordinary gate-keeper role," including appropriately limiting "the theories of litigation to be pursued at trial." *Id.* at 407 (citing *Soule*, 882 P.2d at 303, 309). The Supreme Court said that "[o]ne crucial aspect of the trial court's role is, of course, the task of defining the strict liability legal universe within which a particular jury operates for purposes of discharging its function." *Id.*

DeJesus relies on *Campbell* in support of his argument that he has presented a *prima facie* strict liability claim under the consumer expectations test. He cites to that case for the proposition that in the context of a design defect claim based on the absence of a safety device, the "jury should be given the opportunity to determine whether the facts necessary to impose liability have been established." (Pl.'s Opp. at 35 (citing *Campbell*, 649 P.2d at 232).) In *Campbell*, plaintiff sued the manufacturer of a bus used for public transportation for strict product liability, contending that the manufacturer should have installed a "grab bar" or "handrail" near all of the bus's seats. 649 P.2d at 226. The Supreme Court of California held that the trial court should have submitted the design defect issue to the jury under the consumer expectations standard because "public transportation is a matter of common experience." *Id.* at 232–33.

The same cannot be said for the use of a lift table in a factory setting. The circumstance in which the accident occurred is not one within an ordinary juror's common experience. A factory setting is a highly particularized environment in which to assess if the lift table was

defective because it lacked audio and visual warnings. This determination is not premised solely on the complexity of the lift table, *see Tincher*, 104 A.3d at 402–03, but instead on the degree to which the entire factual circumstance and the question posed under the consumer expectations standard—*i.e.*, whether the failure to install certain safety features on a lift table that is used in a factory falls below minimum safety assumptions of its ordinary consumers—is outside the realm of a lay juror's "common knowledge."[9]  *See Lunghi*, 200 Cal. Rptr. at 393 ("The 'user of a loader' is distinguishable from 'ordinary consumers.' [ ] Frankly, we think that an ordinary consumer would not know what to expect from a piece of heavy machinery like the Bobcat loader . . . .") (citation omitted).

Indeed, without the ability to draw upon their "common knowledge" and without any record evidence suggesting that the danger was "unacceptable," jurors would be left to speculate. *Tincher* cautioned against such an approach:

> In the absence of either common experience or evidence, any verdict would, in effect, be the jury's opinion of how strong the product [s]hould be. Such an opinion by the jury would be formed without the benefit of data concerning the cost or feasibility of designing and building stronger products. Without reference to relevant factual data, the jury has no special qualifications for deciding what is reasonable.

*Tincher*, 104 A.3d at 388.  The use of the consumer expectations test is accordingly inappropriate to evaluate whether the lift table is defective.  *See Ryobi*, 2016 WL 1241860, at *9 (granting partial motion for summary judgment with respect to consumer expectations claim because "there is no triable issue of fact" under that theory of liability); *Punch*, 2015 WL 7769223, at *5

---

[9]       The Court does not read *Tincher*, *Soule* or *Campbell* as barring the application of the consumer expectations test to all complex products.  Indeed, in certain cases involving a complex product the defect may be so apparent that a juror may be able to draw upon his "common knowledge" to evaluate whether the danger was "unknowable and unacceptable."  *See Akers v. Kelley Co.*, 219 Cal. Rptr. 513, 524 (Cal. Ct. App. 1985) ("There are certain kinds of accidents—even where fairly complex machinery is involved—which are so bizarre that the average juror, upon hearing the particulars, might reasonably think: 'Whatever the user may have expected from that contraption, it certainly wasn't that.'").  The facts of this case do not present such an issue.

(holding that plaintiffs failed to state a cognizable strict liability claim under the consumer expectations standard but that the strict liability claim could proceed under the risk-utility theory of liability); *Capece v. Hess Maschinenfabrik GmbH & Co. KG*, No. 12-cv-1542, 2015 WL 1291798, at *3 (M.D. Pa. Mar. 20, 2015) (stating that in a case involving complex machinery plaintiff "agrees that *Tincher*'s consumer expectations test is inappropriate and therefore opposes summary judgment only under the risk-utility test").

**B.**

The risk-utility test is a cost-benefit analysis. *See Tincher*, 104 A.3d at 389. This test provides that a product is defective if a reasonable person would find that "the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." *Id.* The court in *Tincher* stated that this standard "offers courts an opportunity to analyze *post hoc* whether a manufacturer's conduct in manufacturing or designing a product was reasonable, which obviously reflect the negligence roots of strict liability." *Id.* (citations omitted). "The difficulty in presenting the issue to the jury . . . is resolved by reference to Judge Learned Hand's formula, which 'succinctly captures the common sense idea that products are unacceptably dangerous if they contain dangers that might cost-effectively (and practicably) be removed.'" *Id.* at 390.

The Pennsylvania Supreme Court's reliance on *Barker* to define the standard is also instructive. In *Barker*, the California Supreme Court articulated the following factors as relevant to the risk-benefit balancing test for determining the existence of a defect: (1) the gravity of the danger posed by the challenged design; (2) the probability that such danger would occur; (3) the mechanical feasibility of a safer design; (4) the cost of an improved design; and (5) the adverse

17

consequences to the product and consumer that would result by installing the alternative design.[10] 143 Cal. Rptr. at 237 (citations omitted).

DeJesus contends there is sufficient evidence to support a claim under the risk-utility test, relying upon *Punch*, 2015 WL 7769223, and *Nathan v. Techtronic Indus. N. Am., Inc.*, 92 F. Supp. 3d 264, 266 (M.D. Pa. 2015).  (Pl.'s Opp. at 30–35.)  In *Punch*, plaintiffs' child was injured when he ingested the batteries inside a pair of lighted tweezers.  2015 WL 7769223, at *1.  Plaintiffs alleged that the manufacturer defectively designed the tweezers by failing to restrict access to the batteries.  *Id.*  In denying defendant's motion to dismiss plaintiffs' strict liability claim under the risk-utility theory, the court noted plaintiffs' allegations that multiple alternative designs existed that would have restricted [access] and prevented [the accident]," and that such alternative designs were feasible and available at no extra cost.  *Id.* at *5.  These allegations, according to the court, "sufficiently state a cause of action under the risk-utility standard of Pennsylvania's strict liability law . . . [under] *Tincher*."  *Id.*

Similarly in *Nathan*, 92 F. Supp. 3d at 266, plaintiff alleged that a table saw should have had certain safety features, specifically "flesh detection" technology which triggers the blade to stop upon contact with human skin.  The court denied defendant's motion for summary judgment with respect to Nathan's claim under the risk-utility standard, stating that "[d]efendants have utterly failed to show the absence of a triable issue as to whether the failure to incorporate flesh-detection technology rendered the saw defective under the risk-utility test."  *Id.* at 272.  The court stated that even if defendants met their initial burden, Nathan had advanced sufficient facts to

---

[10]   The Pennsylvania Supreme Court in *Tincher* also mentioned a series of factors in evaluating the risk-utility test that have become known as the "Wade" factors.  *Tincher*, 104 A.3d at 389–90.  The court only stated that other courts have recognized these factors as instructive but did not state that they should be adopted as part of Pennsylvania's risk-utility framework.  *Id.*

raise a genuine issue as to whether additional safety technology could be added to the table saw at minimal cost. *Id.* at 273.

Similarly here, there are sufficient issues of fact as to whether the probability and seriousness of the harm caused by the lift table outweighed the burden and cost of installing visual or audio alarms. Knight's president and corporate designee stated that it was possible to equip the lift table with flashing lights or an alarm while in use. (Zaguroli Dep. 93:16–94:3.) He testified that it "was not our responsibility to put signals on [the lift table]" because "[c]ustomers tell us what they want to buy." (*Id.* at 101:6–11.) A manufacturer, however, "has a non-delegable duty to provide a safe product" under Pennsylvania law. *Forrest v. Beloit Corp.*, 424 F.3d 344, 352 (3d Cir. 2005) (citing *Walton v. Avco Corp.*, 610 A.2d 454, 458 (Pa. 1992)). Further, at least one other lift table manufacturer offers audio and visual warnings as safety features on its lift table. (Zaguroli Dep. 124:16–125:20, Ex. 4.) The record is unclear, however, how much it would cost Knight to add such safety features.

On these facts, reasonable minds can disagree over whether the added safety that these audio and visual alarms provide warrants shifting the extra cost of installation onto Knight. Whether the cost of these safety features is reasonable in light of the reduced risk is accordingly an issue best left to the jury. *See Morello v. Kenco Toyota Lift*, 142 F. Supp. 3d 378, 384 (E.D. Pa. 2015) (denying summary judgment on plaintiff's strict liability design defect claim against manufacturer of forklift because "whether the lack of safety devices rendered the forklift defective in design is a question of fact for the jury"); *Capece*, 2015 WL 1291798, at *7 ("Rational jurors could disagree about . . . whether an alternative design would have been more effective, or could even have prevented Capece's injury . . . or whether the probability and seriousness of harm caused by the machine outweigh the cost of taking such precautionary

measures."); *Nathan*, 92 F. Supp. 3d at 273 (denying summary judgment with respect to risk-utility claim because "rational jurors could disagree about whether a $50 increase in the manufacturing cost of a saw that would otherwise sell for $400 is an unreasonable cost.").

### C.

There are sufficient facts in the record, when viewed in the light most favorable to DeJesus, to sustain the remaining elements of a strict liability design defect claim: that the product defect proximately caused his injuries and that the lift table left Knight's control with the defect. *See Ryobi*, 2016 WL 1241860, at *5. The *Tincher* analysis does not affect these remaining elements, though Judge McLaughlin did not assess them since she found no product defect. Knight fails to address either of these two questions in its moving brief and instead focuses solely on the issue of product defect. (*See generally* Def.'s Mot.)

In order to establish proximate cause, there must be a finding that product defect was a "substantial factor in bringing about the accident, even though it need not be the only factor." *Pa. Dep't of Transp. v. Phillips*, 488 A.2d 77, 86 (Pa. 1984) (citation omitted). A plaintiff's "negligent conduct is not relevant if the product defect contributed in any way to the harm." *Jara v. Rexworks, Inc.*, 718 A.2d 788, 793–94 (Pa. Super. Ct. 1998), *appeal denied*, 737 A.2d 743 (Pa. 1999); *Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 637 A.2d 603, 607 (Pa. 1993) (holding that a defendant may not assert comparative negligence in a strict products liability action).[11]

There are sufficient facts on this record to suggest that the product defect—the absence of audio and visual warnings on the lift table—proximately caused DeJesus's injuries. To defeat

---

[11]     However, "where the defense offers evidence to show that the accident occurred solely as a result of the plaintiff's conduct, the plaintiff's actions are relevant and admissible to prove causation." *Fralish v. A.O. Smith Corp.*, 2004 WL 1587559, at *8 (Pa. Super. Ct. July 7, 2004), *appeal denied*, 871 A.2d 191 (Pa. 2005) (citing *Jara*, 718 A.2d at 788).

causation, Knight would have to demonstrate that the accident was solely attributable to a supervening cause. *See also Richetta v. Stanley Fastening Sys., L.P.*, 661 F. Supp. 2d 500, 511 (E.D. Pa. 2009). Viewing these facts in the light most favorable to DeJesus, Knight is unable to make such a showing. *See also Jara*, 718 A.2d at 793–94 (stating that in strict liability claim against manufacturer of conveyer belt that lacked certain safety features, "it could not be established that the accident was solely a result of Mr. Jara's or another's conduct. Rather, as noted by the jury, the product defect was a substantial factor in contributing to Mr. Jara's injury"); *Clark v. Bil-Jax, Inc.*, 763 A.2d 920, 924 (Pa. Super. Ct. 2000) ("[E]ven where the accident is not specifically attributable to the product defect, the harm caused by that defect concomitant with the accident can result in liability of the manufacturer of the defective product to the injured person."). The question is accordingly best left to the jury. *See Richetta*, 661 F. Supp. 2d at 512.

Further, there is no dispute that the lift table left Knight's control without the audio and visual devices. DeJesus may proceed on his strict liability design defect claim under the risk-utility framework articulated in *Tincher*.

## VI.

DeJesus contends that Knight is not entitled to summary judgment on his negligent design claim "because Judge McLaughlin clearly misapplied Pennyslvania law by dismissing that claim solely on the grounds that [DeJesus] had failed to prove a product defect under the Third Restatement of Torts." (Pl.'s Opp. at 2.) He argues that the Court would not be exceeding the scope of its authority on remand in addressing the negligent design claim because Judge McLaughlin's analysis linking the viability of the negligent design claim to the strict liability

claim was "clearly erroneous and would work a manifest injustice."  (*Id.* at 2–3 (citations and internal quotation marks omitted).)

The Court, however, need not analyze the propriety of dismissing a negligent design claim on the basis that plaintiff failed to show a product defect.  Judge McLaughlin's ruling on DeJesus's negligent design claim rested on her finding that there was no design defect under the Third Restatement.  Since the Court has determined that DeJesus can demonstrate a design defect under *Tincher*, it must necessarily reevaluate his negligent design claim.

"[T]he standard for establishing liability of a product manufacturer under a negligence theory would be more stringent and, thus, more difficult to satisfy" than a strict liability claim. *Schwartz v. Abex Corp.*, 106 F. Supp. 3d 626, 654 (E.D. Pa. 2015) (citing *Tincher*, 104 A.3d at 364, 401).  To prevail in a negligence action, the plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question and actual loss or damage.  *See Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000, 1008 (2003).  Determining whether a duty exists under a particular set of facts is a question of fairness.  *See Brandjord v. Hopper*, 688 A.2d 721, 723 (Pa. Super. Ct. 1997); *see also Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1222 (Pa. 2002) ("[T]he legal concept of duty is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice, and society."); *Gutteridge v. A.P. Green Servs., Inc.*, 804 A.2d 643, 655 (Pa. Super. Ct. 2002) ("The mere fact an accident occurred does not entitle the injured person to a verdict.") (citing *Ney v. Axelrod*, 723 A.2d 719, 721 (Pa. Super. Ct. 1999)).

Whether a defendant owes a duty of care to a plaintiff is a question of law in Pennsylvania.  *See Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1366 (3d Cir. 1993).

Where the existence of a duty depends on the outcome of the facts, however, the jury must make a conclusion as to the facts before the issue of whether the defendant owed the plaintiff a duty of care can be resolved.  Restatement (Second) of Torts § 328B cmt. e (1965) ("Where the existence of the duty will depend upon the existence or non-existence of a fact as to which the jury may reasonably come to either one of two conclusions . . . then it becomes the duty of the court to instruct the jury as to the defendant's duty, or absence of duty, if either conclusion as to such fact is drawn.")  "Thus, if a plaintiff has produced sufficient evidence such that there is an issue as to whether the defendant owed him a duty of care, a negligence claim will survive summary judgment." *Kagan v. Harley Davidson, Inc.*, No. 07-cv-0694, 2008 WL 3874824, at *16 (E.D. Pa. Aug. 20, 2008) (citing *Phillips*, 841 A.2d at 1010).

When analyzing whether the defendant owed a duty, the Court must apply the "*Althaus* test," which requires consideration of: (1) the relationships between the parties; (2) the social utility of the defendant's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the defendant; and (5) the overall public interest in the proposed solution.  *See Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000). No single factor is dispositive; rather, "a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant."  *Phillips*, 841 A.2d at 1008–09.

First, Knight knew during the manufacturing process that it was designing a lift table for Harley Davidson employees.  Knight's president stated that it could create the lift table to Harley Davidson's specifications.  This pre-existing relationship weighs in favor of the existence of a duty.  *See id.* at 1009 ("As to the first prong of the *Althaus* test, there was clearly a relationship between Robyn, as the purchaser of the butane lighter, and Appellants.  Thus, as to the negligence claim springing from Robyn's death, this prong weighs in favor of finding a duty.").

Second, the Court must examine the social utility of Knight's conduct—the production of a lift table without audio and visual alarms.  There is no evidence in the record to suggest that the lift table is any more functional without these safety features than it would be with them. Viewing the facts in the light most favorable to DeJesus, the addition of such safety features makes the device marginally safer without any loss in functionality to the lift table.  This factor accordingly weighs in favor of the existence of a duty.  *See id.* (finding the second of *Althaus* test factor weighed in favor of finding duty where "the evidence does not show that the utility of the lighter is increased when a child safety device is lacking").

The third prong of the duty inquiry balances social utility of a design against the extent and foreseeability of the harm that would result in its absence.  *See Althaus*, 756 A.2d at 1170. "A duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others."  *R.W. v. Manzek*, 888 A.2d 740, 747 (Pa. 2005).  Here, the record suggests that Knight did not foresee the danger that manifested itself and caused DeJesus's injuries. Indeed, in support of his contention that the danger was "unknowable" under the consumer expectations theory of liability, DeJesus argues that "the ordinary consumer of the lift table would not reasonably expect that the lift table could catch or snag a heavy piece of nearby equipment and topple it, inflicting life-threatening injuries."  (Pl.'s Opp. at 34.)  The record reflects a similar unforeseeability from Knight's point of view: President James Zaguroli testified that prior to this incident Knight was unaware of a single instance "where a table struck a person or object as it was going up."  (Zaguroli Dep. 102:10–17.)  He further testified that he was unaware of any accidents involving the lift table and received no complaints involving the lift tables Knight manufactured.  (*Id.* 104:2–5.)  Zaguroli also stated that no customer had previously requested that a lift table be designed with audio and visual alarms.  (*Id.* 93:1–5.)

24

The inquiry, however, does not turn on whether or not Knight actually foresaw the risk, but instead on whether Knight should have foreseen the risk. *See, e.g.*, *Schmoyer by Schmoyer v. Mexico Forge, Inc.*, 649 A.2d 705, 708 (Pa. Super. Ct. 1994). There are facts in the record to support a jury answering that question in the affirmative. For example, Zaguroli testified that Knight was aware that the lift table was commonly used on a manufacturing line and users of the lift table placed equipment adjacent to the lift table while working. (Zaguroli Dep. 110:19–120:12.) Knight also guarded against other accidents that could occur while the lift table was in use—such as a heavy load sliding off the tabletop—and a reasonable jury might conclude that knocking over nearby machinery was similarly foreseeable. Further, at least one other manufacturer equipped its lift tables with audio and visual alarms, suggesting that Knight should have reasonably foreseen the danger that manifested itself in this case. (*Id.* 124:16–125:20, Ex. 4.) Whether this danger was reasonably foreseeable is accordingly a question better left to the jury.

The fourth factor requires the Court to analyze the consequences of imposing a duty on Knight. *See Phillips*, 841 A.2d at 660 (stating that this factor weighed in favor of the existence of a duty because plaintiff "adduced evidence that such cost [of childproofing lighter] would be nominal"); *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 67 (3d Cir. 2009) ("Given the minimal cost of adding an alternative design, and the potentially monumental financial and human cost of not doing so, this factor clearly weighs heavily in favor of a duty."). Here, although DeJesus does not cite any evidence demonstrating the financial cost of imposing such a duty on Knight, he contends that Zaguroli "acknowledged in his deposition testimony that placing these devices on its lift table would impose little to no additional manufacturing burden on [Knight]." (Pl.'s Opp. at 23.) DeJesus does not cite to where in the deposition Zaguroli purportedly made this

statement and the Court does not read his testimony as suggesting that Knight could have included the audio and visual alarms at minimal *financial* cost.  Rather, Zaguroli confirmed that it was feasible to add such safety features but did not make any statements regarding their marginal cost.  (*See* Zaguroli Dep. 92:2–108:21.)  Knight, however, has not pointed to any facts regarding the cost of installing these additional safety features.  *See Kagan*, 2008 WL 3874824, at *16 (finding that the fourth *Althaus* factor weighed in favor of finding a duty of care where defendant did "not refute[ ] the contention that the cost of adding the [safety feature] would be minimal").  Without evidence regarding the marginal costs of adding these safety features, the Court is unable to determine whether this factor weighs in favor of finding the existence of a duty of care.

The fifth and final *Althaus* factor calls for the Court to analyze the overall public interest in imposing such a duty on Knight.  In *Berrier*, the Third Circuit stated that this factor should not be "conflated [with] a cost/benefit analysis."  563 F.3d at 67.  In that case, the Third Circuit held that the district court erred by balancing "the consequences of imposing the duty on [defendant]" against the benefit to the public from the installation of the safety features.  *Id.* at 67–68.  The Third Circuit held that this factor calls solely for a consideration of the public benefit.  *Id.*

Here, a marginally safer product for use in a factory containing heavy machinery will serve as a benefit to workers who would otherwise be subject to such risks on a daily basis.  The Court, however, does not find this factor to weigh heavily in favor of finding the existence of a duty on these facts.  The record reflects that the danger that manifested itself in this case is rare, and a triable issue remains regarding the effectiveness that audio and visual alarms will have in preventing this type of injury.

26

In weighing all five of the *Althaus* factors, and viewing the evidence in the light most favorable to DeJesus, there are genuine issues of material fact that must be resolved before the Court can determine whether Knight owed a duty of care.  *See Kagan*, 2008 WL 3784824, at *16 ("In conclusion, analyzing all five of the duty factors in the light most favorable to Kagan demonstrates that there are genuine issues of material fact that must be resolved before there can be a determination regarding whether Harley Davidson owed a duty of care to Kagan."); *Phillips*, 841 A.2d at 1010 (analyzing the five factors relevant to duty and concluding that the plaintiff "had adduced sufficient evidence such that [the negligence] claims survive[d] summary judgment on the issue of the existence of a duty of care").  In the presence of such issues, the Court must permit DeJesus's claim to survive summary judgment on this element.

There are also disputed issues of material fact with respect to the remaining elements of a negligent design claim.  Specifically, in order to demonstrate a breach DeJesus must advance facts to show that Knight's design of the lift table "deviated from an accepted standard of care." *Hoffman v. Paper Converting Mach. Co.*, 694 F. Supp. 2d 359, 367 (E.D. Pa. 2010).  Viewed in the light most favorable to DeJesus, the facts in the record are sufficient to allow a jury to find that the absence of video or audio alarms breached the standard of care that Knight owed to DeJesus.  *See Phillips*, 841 A.2d at 1010 ("As the parties do not contest that the butane lighter in question lacked a child-safety device, then there is clearly evidence to support a finding that Appellants breached their duty.").  Further, for the same reasons discussed *supra* Section V.C, a

jury could reasonably find that the breach—*i.e.*, the absence of the alarms on the lift table—proximately caused DeJesus's injuries.[12]

## VII.

The Court concludes by addressing two issues regarding expert testimony.  The Court's decision on Knight's motion would remain the same even if Dr. Rider had not been excluded.  Second, the absence of Rider or any other expert on behalf of DeJesus is not fatal to his claims on these particular facts.

Knight contends that DeJesus's claims must fail because he does not have an expert.  (Def.'s Reply in Supp. of Def.'s Mot. at 5, ECF No. 118.)  That is not necessarily the case.  In *Chubb v. On-Time Wildlife Feeders*, 578 F. Supp. 2d 737, 739 (3d Cir. 2008), the Third Circuit stated that it has "never foreclosed the possibility that a defective condition may be established through non-expert evidence."  *Id.* (citations omitted).  The court noted that the "proper analysis is whether the asserted defect is obvious enough to be ascertainable to the average juror without speculation."  *Id.*

In this case, Knight has conceded the one issue that potentially required expert testimony: whether the installation of audio and visual warnings on the lift table was feasible.  Other issues such as the cost of equipping the lift table with audio or visual alarms, foreseeability and causation are all factual issues that DeJesus could conceivably prove in this case through competent fact witnesses.

---

[12]     Judge McLaughlin granted summary judgment on Maria DeJesus's loss of consortium claim since she granted summary judgment on each of DeJesus's underlying claims.  Here, since DeJesus may proceed on his strict liability and negligent design claims, and since Knight did not seek summary judgment on Maria DeJesus's loss of consortium claim on any other grounds, that claim also survives summary judgment.  DeJesus's failure to warn claim, however, does not.  *Tincher* does not affect Judge McLaughlin's decision to grant summary judgment with respect to that claim and the Court need not revisit that decision on remand.  *See Hatcher v. SCM Grp. N. Am., Inc.*, No. 15-cv-1630, 2016 WL 807731, at *4 (E.D. Pa. Mar. 1, 2016), *appeal dismissed* (July 5, 2016) (stating that *Tincher* currently does not extend to failure to warn cases, although recognizing that the Pennsylvania Supreme Court recently granted allocator in a case that may extend *Tincher* to these claims).

In any event, the Court will permit the parties to engage in a period of supplemental discovery since *Tincher* has changed the strict liability standards in Pennsylvania.  Specifically, since the parties completed all discovery under the pre-*Tincher* framework, the Court will provide DeJesus and Knight with an opportunity to take fact and expert discovery on DeJesus's strict liability design defect claim brought pursuant to the risk-utility test.

An appropriate Order follows.

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.